IN THE UNITED STATES COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| YE, et al., | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | NO. 04-951 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

Giles, C.J.                                                                                                              December 22, 2005

I.   **Introduction**

On March 3, 2004, Zi Ye and Yu Zhen Cao filed a Complaint against the District Health Center # 10 and Ikjin Kim, M.D., alleging violations of the: (1) Federal Tort Claims Act (Count I); (2) Rehabilitation Act (Count II); (3) Americans with Disability Act (Count III), and (4) Fourteenth Amendment to the federal Constitution, pursuant to 42 U.S.C. § 1983 (Count IV). See Plaintiffs' Complaint ("Pls.' Compl.") dated March 3, 2004. Now before the court are the parties cross-motions for summary judgment made pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

Plaintiffs are proceeding on only two claims, both found in Count IV of the Complaint. They sue Dr. Kim on a "state created danger" theory, alleging that the doctor "abandoned" his patient, Mr. Ye, when he knew that Mr. Ye was in dire need of emergency hospital intervention on March 5, 2002. Mr. Ye presented with classic symptoms of congestive heart failure and with significant history of heart problems, all of which was known to Dr. Kim. Plaintiffs sue the City alleging that it had an established policy or practice that precluded a safe clerical system to assure that objective

tests ordered by a Health Center physician were promptly done. All other claims asserted by plaintiffs in their Complaint are withdrawn, and accordingly, dismissed with prejudice.

The standard for the analysis in this case is reckless indifference, not negligence or gross negligence. Reckless indifference requires a conscious disregard for a known danger and a conscious disregard for the possible consequences of that reckless endeavor. So, the question presented here is whether the evidence in the case could be fairly adjudged by a reasonable jury to constitute more than medical incompetence on the part of Dr. Kim. For the reasons that follow, the City's Motion for Summary Judgment as to the first remaining claim is denied, while the City's Motion for Summary Judgment as to the second remaining claim is granted.

## II.     Undisputed Facts

The case history regarding Dr. Kim, as of March 5, 2002, the critical date, is best summarized in the light most favorable to plaintiffs from a recitation by one of plaintiffs' medical expert reports submitted in opposition to defendants' summary judgment motion. Charles J. Faselis, M.D., associate professor of medicine at the George Washington University Medical Center, in Washington D.C., states the following:

> . . . Mr. Ye returned to see Dr. Kim on 3/5/02. His weight was now 196 lbs, his blood pressure 164/90, respiration of 18 and pulse of 72. Despite a notation from the last office visit that an EKG was to be performed[,] no EKG was performed. Dr. Kim was responsible to make sure an EKG was obtained. Dr. Kim testified that he does not recall anything about the last visit. There is no clear history recorded. Dr. Kim noted that there was pitting edema bilaterally. Dr. Kim wrote orders for Lopressor, Norvasc, Lipitor, aspirin, Isordil and Dyazide. There is a notation to have an EKG on the next visit before seeing the doctor. There is also a reference that lab studies need to be scheduled. Dr. Kim prescribed cough medicine and told Mr. Ye to return in 3 months. Dr. Kim testified that he presumed Mr. Ye was seeing other physicians, but he also made no attempt to get any

records or speak to any other physician. <u>This just is not a mere deviation from the required standard of care, it is an abandonment of a patient in a life threatening condition.</u>

Several hours before Mr. Ye's ultimate collapse[,] he was in Dr. Kim's office presenting with pitting edema. Mr. Ye had significant weight gain along with his classic risk factors for cardiac and life threatening problems, yet no EKG was obtained. Dr. Kim should have hospitalized Mr. Ye immediately and addressed the significant edema. Instead, he gave him some cough medicine and told him to come back in three months. <u>This conduct is a professional outrage, caused Mr. Ye serious harm and is shocking.</u>

On 3/6/02[,] Mr. Ye was found by his son at home incontinent, with labored breathing, pale coloration, cold extremities, shaking and was bubbling at the mouth, with a questionable loss of consciousness. He was intubated by EMS personnel at his home and transported to Frankford hospital. Diagnostic studies performed on admission indicated that he was in florid congestive heart failure and had a myocardial infarction. Cardiac catheterization was performed on 3/6/02, which revealed severe multi-vessel coronary artery disease and an intra-aortic balloon pump was placed. John Pym M.D. performed emergency triple vessel coronary artery bypass graft surgery. Postoperatively[,] Mr. Ye was diagnosed with quadriparesis secondary to critical care polyneuropathy, and respiratory failure requiring prolonged mechanical ventilation. Tracheostomy was performed and he required insertion of a PEG tube for feeding. <u>See</u> Plaintiffs' Response to Summary Judgment ("Pls.' Response"), at Exh. C, p. 6-7 (emphasis added).

### III.   Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). <u>See</u> also <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (holding the entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the

existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."). The moving party bears the initial burden of proving that no genuine issue of material fact is in dispute. See Celotex, 477 U.S. at 323; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving party has carried this burden, the nonmoving party may not rest upon the mere allegations in its pleadings, but must set forth specific facts demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (holding that the "mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for plaintiff.").

**IV.    Discussion**

A. State-Created Danger Doctrine pursuant to 42 U.S.C. § 1983.

The totality of the admissible evidence could reasonably show that on March 5, 2002, Dr. Kim actually knew, as opposed to "should have known," that his patient, Mr. Ye, was in a life threatening condition and that that condition warranted emergency hospitalization and, further, that if Mr Ye did not have such immediate intervention, he was at great risk of not being able to rescue himself after leaving the health center. The evidence fairly shows that Mr. Ye did not, and perhaps could not, attempt self-rescue. Within a few hours of leaving Dr. Kim's office, believing that he was doing fine because Dr. Kim told him so, he had congestive heart failure and a heart attack. The evidence at this stage is such that a reasonable jury could find that, upon releasing him to go home, Dr. Kim abandoned both his patient and his professional responsibility with reckless indifference. It is a jury issue whether Dr. Kim's alleged failures on March 5, 2005 were the result of medical malpractice or reckless indifference.

The defense alleges that Mr. Ye was not imprisoned by Mr. Kim, being free to seek other medical opinions or treatments upon leaving Dr. Kim's office on March 5, 2002. Plaintiffs' medical experts, though, have opined that Mr. Ye did not have any time for self-rescue since he was already in need of emergency room admission when Dr. Kim saw him. Without such immediate treatment, they suggest, Mr Ye faced life-threatening consequences.

Plaintiffs rely upon the "state-created danger" doctrine,[1] cognizable under 42 U.S.C. § 1983. See Pls.'s Compl. ¶ 103, 104. In order to prove state-created danger, plaintiffs must show: (1) that the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state acted in willful disregard for plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state actor used his authority to create an opportunity for danger that otherwise would not have existed. See Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1999). This court concludes that all four prongs are sufficiently satisfied by evidence, and inferences therefrom, taken in the light most favorable to plaintiffs. A jury determination of all essential facts in dispute is required.

First, the harm caused to Mr. Ye is reasonably capable of being found to have been foreseeable and direct. Under the "state-created danger" doctrine, a harm is foreseeable, thus putting the actor on notice that his or her actions or failure to act significantly enhances that risk of harm, when a state actor has actual knowledge of the risk of harm to an individual or class of individuals. See Gremo v. Karlin, 363 F.Supp. 2d 771, 784-85 (ED. Pa. 2005) (citations omitted).

A jury could find that Dr. Kim was actually aware, on March 5, 2005, that Mr. Ye was at risk for significant cardiovascular failures. He actually observed what plaintiffs' experts describe as

---

[1] Defendants assert that Plaintiffs failed to sufficiently plea the state-created danger doctrine. Plaintiffs sufficiently pled the state-created danger doctrine, as evidenced in paragraphs 103 and 104 of the Complaint.

classic symptoms of congestive heart failure, and he knew Mr. Ye's significant history of cardiac problems, prior strokes, significant chest pain, pinning of legs, uncontrolled blood pressure, and borderline diabetes.  See Pls.' Response at Exh. G.  On that day, Dr. Kim, by examination, noted bilateral pitting edema of the feet, shortness of breath and discomfort in the heart area, dramatic weight gain and significantly higher blood pressure.  See id.  Dr. Kim was also aware of the results of a prior EKG and knew that an EKG recently ordered by him had not been done.  See Pls.' Response at Exh. H, p. 128.  Dr. Kim has admitted that Mr. Ye presented with "risk factors for a coronary artery disease," and "[Mr. Kim] had risk factors" for a heart attack.  See Pls.' Response at Exh. H, p. 61, 64.

Plaintiffs' expert opinions suffice to show that it was well known medically that the condition presented by Mr. Ye, if untreated on an emergency basis, could result in all the consequences actually suffered by him.  See Pls.' Response at Exh. C, p. 8 & Exh. D, p. 4-5.

Taken together, the jury could plausibly conclude that Dr. Kim had to have known on March 5, 2002 that his decision not to provide necessary treatment would significantly enhance Mr. Ye's risk of harm and that he nonetheless chose to surrender Mr. Ye to a gamble that he might get better at home.  Dr. Kim had no independent recollection of the visit (see Pls.' Response at Exh. H, p. 122); no explanation for not causing an EKG testing to be done (id. at 80, 125, 133); and was not rushed in his examination of Mr. Ye or too busy with other patients (id. at 125).  In the absence of a plausible explanation for the choices made, a jury could infer that there was an improper motivation.  Thus, the acute heart attack and cardio-respiratory decompensation could be found to have been a direct and foreseeable result of a wrongful act.

The second prong of the state-created danger theory requires Plaintiffs to prove that Dr. Kim

acted in willful disregard of Mr. Ye's safety. See Kneipp, 95 F.3d at 1208. The standard of "willful disregard" is substantially the same as conduct that "shocks the conscience" or is "deliberately indifferent." Plaintiffs have adduced sufficient evidence to raise a material issue as to whether Dr. Kim acted with reckless indifference, which, in the context of life or death decision-making, could shock the conscience of a reasonable person. See Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 910 (3d Cir. 1997) (holding that the term "willful" indifference is somewhat misleading, requiring no intent to harm, but a failure to act appropriately in light of a known or obvious risk); see also County of Sacramento v. Lewis, 523 U.S. 833 (1998) (noting that a Fourteenth Amendment violation must be premised on "conscience-shocking.").

The jury can reasonably find that Dr. Kim acted with knowing disregard of an obvious high degree of danger to Mr. Ye. Although he knew of Mr. Ye's significant and life threatening cardiac risk factors, Dr. Kim disregarded them for reasons that he cannot now explain. Dr. Kim's failure to recognize classic symptoms of congestive heart failure in light of Mr. Ye's significant cardiac history could possibly be characterized as deliberate abandonment of the patient to fate.

The patient was told "there is nothing to worry about," and "you are fine," "you will be alright," "you will be able to see me in three months," "do not worry about a thing," and was sent away with cough medicine, although Mr. Ye's lungs were found to be clear upon physical examination. See Pls.' Response at Exh. B. These assurances reasonably could have created a reliance on the part of the patient. Dr. Kim told Mr. Ye what a sick patient would have hoped to hear from a doctor, that is, that he was not in any danger and could go home, relax and would get better.

For plaintiffs, S.J. Schneller, M.D., of the Columbia University Medical Center, states:

> Dr. Kim . . . acknowledged in [his] deposition that [he] knew he had serious and significant risk factors, yet [he] did not refer or hospitalize him for the necessary cardiac diagnostic and therapeutic intervention. The patient used sublingual nitroglycerine with relief of chest discomfort daily and about twenty times a month despite other medical therapy. His presentation on March 5, 2002, now with pitting edema bilaterally, called for emergent hospitalization. <u>Dr. Kim sent him away.</u> <u>It is unconscionable.</u>  Pls.' Response at Exh. D, p. 4 (emphasis added).

Plaintiffs have sufficiently raised a material question of fact as to whether Dr. Kim abandoned Mr. Ye and, under the circumstances presented, are entitled to attempt to prove that Dr. Kim's conduct is explained by callousness and not carelessness.

Third, plaintiffs have proffered a sufficient question of material fact as to the third prong of <u>Kneipp</u> – a relationship between the state and the person injured, – during which the state agent placed the alleged victim in danger of a foreseeable injury. It is alleged that Dr. Kim, exercising his power and authority as a City medical doctor, placed Mr. Ye in danger of foreseeable injury when he sent him home, telling him he that he was fine and that he would not have to see a doctor for three months. This affirmative assurance given to Mr. Ye that he was not in danger of dying arguably created complete reliance on Dr. Kim's diagnosis and prescriptions, and separated Mr. Ye from private rescue. In <u>Rivas v. City of Passaic,</u> 365 F.3d 181 (3d Cir. 2004), an issue of fact was created when allegedly there was a knowing misrepresentation by City rescue workers of the plaintiff's seizure condition to police officers who had been summoned by them to the scene to control the plaintiff who was described as an assaulter. Instead of helping the plaintiff, who was suffering from a serious medical condition known only to the City rescuers, the police proceeded to deal with him as a person who was healthy and belligerent. Dr. Kim's assurances could be reasonably construed as knowing misrepresentations of the medical truth, which at the time critical for Mr. Ye's safety,

only he knew.  A reasonable jury, therefore, could find that Dr. Kim exerted sufficient control over Mr. Ye to meet the relationship requirement of Kneipp.

The court finds that a jury could reasonably find that the fourth and final requirement of Kneipp is satisfied.  The summary judgment record is sufficient to raise a material issue of fact as to whether Dr. Kim used his authority as a medical doctor to make Mr. Ye more vulnerable to danger than he would have otherwise been.  A constitutional violation may occur when the state acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of the state intervention.  See DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 201 (1989).  The third circuit has found causation under the "state-created danger" theory where there was direct evidence that the harm suffered by the plaintiff was traceable to the intervention of the state actors.  See Rivas, supra, at 197.; see also Kneipp, supra, at 1201-03 (holding that police officers created a risk of harm by detaining an extremely intoxicated woman who was being walked home by her intoxicated husband/protector, by requiring the husband to proceed home separately and by directing the woman to go home alone.).  A jury could find that Mr. Ye was in a worse position after Dr. Kim intervened than he would have been if the doctor had not assured him that he was fine.  Had he not been given strong assurances for recovery, Mr. Ye may have gone to a hospital emergency for care.

Accordingly, we hold that at this stage, the "state-created danger" theory is an available avenue for plaintiffs to attempt to establish constitutional liability against Dr. Kim under 42 U.S.C. § 1983.  Qualified immunity on this record is not applicable as a defense since Dr. Kim had to have known that the deliberate abandonment of a patient in his care could shock the conscience and subject him to liability under the teachings of Kneipp.

B. <u>Municipal Liability pursuant to 42 U.S.C. § 1983.</u>

Plaintiffs also argue that municipal liability can be imposed on the City. The Complaint avers that the District Health Center # 10 had a "custom, policy and practice" of failing to "properly screen, hire, employ, contract with, train, retain, and supervise their physician agents," and that such alleged failures caused the harm suffered by Mr. Ye. <u>See</u> Pls.' Compl. ¶ 96, 97. Specifically, they assert that Dr. Kim should have ordered, among other tests, an EKG on March 5, 2002. <u>See</u> Pls.' Response at 22-23. Plaintiffs argue that the City's liability can be premised on its "failing to enact adequate procedural safeguards" to prevent the oversights that resulted in Mr. Ye's injuries. <u>See</u> Pls.' Response at 21, 26-27. This court finds that plaintiffs have not adduced, and cannot provide, evidence sufficient for imposition of liability under <u>Monell v. New York City Dept. Of Social Services,</u> 436 U.S. 658 (1978).

Despite plaintiffs' pleadings and arguments, the undisputed evidence shows that the City did have in place for all of its Health Centers a system for the giving of objective tests to patients and that it did train nurse personnel to follow up on doctor ordered tests and to see that the tests ordered were performed. It hired physicians believed to be capable of making competent medical diagnoses, and capable of reading and understanding objective test results. Mr. Ye's unfortunate situation arose because allegedly individuals responsible for his care, for reasons having nothing to do with their training, were lax, careless or uncaring. Plaintiffs cannot prove that the City was uncaring or recklessly indifferent or that the highest City official responsible for the professional operation of the City's Health Centers knowingly caused a deficient health delivery system to exist at District Health Center #10.

Plaintiffs assert that "although the health center had in place a system for referring patients to affiliated hospitals, Dr. Kim was not trained in the application of that system." Pls.' Response at 22. This assertion is directly contradicted by undisputed evidence. Dr. Kim testified:

> Q: How did you learn about the referral policy at the health clinics that have patients seen by specialists?
>
> A: We were told at the health clinic after I got the job.
>
> Q: Was there any —
>
> A: There is a system – there is a system for referral to the affiliated hospitals.

Pls.' Response at Exh. H, p. 145. Furthermore:

> Q: Did the District Health Center have any written policies and procedures as to how or when you should refer patients to specialists?
>
> A: No, not particularly. No specific.
>
> Q: Okay.
>
> A: Because —
>
> Q: You —
>
> A: I don't think need any special education for that, because it's just, have a form how to do it. [sic]. That's all we know. We learn how to do. It's very simple.

Dr. Kim Dep., June 7, 2005, 147:2-13.

Dr. Kim testified that he could refer to a specialist whenever he thought such was warranted

-11-

and, in fact, had referred over "several hundred" patients to specialists every year. Id. at 89: 12-91:11. Dr. Kim's failure to refer Mr. Ye for a cardiac consultation was not due to unfamiliarity with the referral system, or any systemic problem with referring patients, as attested by the number of referrals. In sum, plaintiffs have not shown, and cannot show, that the City-wide systems that Dr. Kim said were in place did not exist.

Plaintiffs allege that "there was no mechanism in place at the Health Center to ensure that [the records] were obtained." Pls.' Response at 22. However, nurse Patricia Ann Turco, R.N., testified to the contrary:

> Q: You've done EKGs —
>
> A: Yes.
>
> Q: On many, many patients at the Health Center 10?
>
> A: Yes.
>
> Q: And you've done them when, for instance, similar to April 20th, 2001, the patient comes in, vital signs are taken and then the patient is sent for an EKG, correct?
>
> A: Yes.
>
> Q: When you saw Mr. Ye on March 5th, 2002, did you go back and look at the April 9th, 2001 note?
>
> A: I would have to say, to my knowledge, no.
>
> Q: Did the City of Philadelphia train you, that you should look at the last note from the last office visit to see what's going on with this patient?

    A:  I would have to say — I would have to say yes.

Pls.' Response at Exh. L, p. 44.

   Proof of a single incident by a municipal employee does not suffice to establish that an official policy or custom caused the constitutional violation.  See City of Oklahoma City v. Tuttle, 471 U.S. 808, 813 (1985) (holding that a single, unusually excessive use of force may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to 'deliberate indifference' or 'gross negligence' on the part of the officials in charge.).  Plaintiffs have adduced no evidence relating to other instances when failure to adhere to existing Health Center policies caused constitutional harm of the type suffered by Mr. Ye.

   Under Monell, a municipality cannot be held liable as *respondeat superior*.  See id. at 691. A municipality can only be held liable where there is evidence showing that the alleged constitutional violation was a result of a municipal policy, custom or practice.  See id. at 694 (holding that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.).  A "direct casual link between a municipal policy or custom and the alleged constitutional deprivation" must be established.  City of Canton v. Harris, 489 U.S. 378, 385 (1989).

   Plaintiffs' reliance on Berg v. County of Allegheny, 219 F.3d 261 (3d Cir. 2000) and Natale v. Camden County Correctional Facility, 318 F.3d 575 (3d Cir. 2003) is unavailing.  Those cases deal with situations where the ultimate decision making was left up to clerical systems as opposed to independent reviewers responsible for the accuracy of the treatment decisions.  Here, the City had in place a review system of the entire health history of each individual patient by a trained medical doctor, the ultimate decision maker.  Dr. Kim was at liberty to require whatever tests he deemed

appropriate, and had at his disposal an EKG machine which could have given him results in ten to twenty minutes.  Any failure to use the systems in place to protect the health of Mr. Ye was not the fault of a clerical system.

Plaintiffs have adduced no evidence of a City "policy, custom or practice" that led to the alleged constitutional violation.  Dr. Kim and the nurses at District Health Center #10 were not "policymakers."  The municipal liability claim cannot survive the summary judgment motion.  The <u>Monell</u> claim fails.

### V.     Conclusion

For the foregoing reasons, the City's Motion for Summary Judgment as to the first remaining claim is DENIED, while the City's Motion for Summary Judgment as to the second remaining claim is GRANTED.